IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 4, 2003

## STATE OF TENNESSEE v. JERRY LEE HONEY

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 6553    Jon Kerry Blackwood, Judge**

---

**No. W2002-01187-CCA-R3-CD - Filed May 15, 2003**

---

The Defendant, Jerry Lee Honey, was convicted by a jury of two counts of first degree premeditated murder and sentenced to two concurrent terms of life imprisonment. The Defendant now appeals, challenging the sufficiency of the evidence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Ricky Griggs and Shana McCoy Johnson, Assistant Public Defenders, Bolivar, Tennessee, for the appellant, Jerry Lee Honey.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Elizabeth Rice, District Attorney General; and J. Walter Freedland, Jr. and Ryan Brown, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

The Defendant shot and killed his estranged wife and her boyfriend. The only issue raised by the Defendant in this appeal is whether the State adduced sufficient proof that the Defendant committed the killings intentionally and with premeditation. We conclude that it did.

In March 2001, the Defendant was living with his friend John Coolidge. The Defendant's wife, victim Sherri Honey, had filed for divorce earlier in the year and remained in the home with the couple's two daughters, which was about a thirty-five minute drive from the Coolidge residence. Ms. Honey's boyfriend, victim Matthew Roberts, was living with Ms. Honey and the children.

In late February, Ms. Honey took possession of the Defendant's truck, a small pick-up. By all accounts, including his own, the Defendant was very upset by this turn of events. The Defendant testified that the truck was the only thing he was left with from the marriage, and the proposed

marital dissolution agreement called for him to keep the truck. However, the truck was registered in Ms. Honey's name, and the Defendant had not yet signed the marital dissolution agreement when she took possession of it.

At the time of the homicides, the Defendant had quit his job and was looking for new employment. On March 15, 2001, he received his income tax refund check and was in a good mood. He ate dinner with the Coolidge family and appeared fine. After dinner, he borrowed the Coolidge's Lincoln automobile and drove to a bar. He played pool and drank until the bar closed at approximately three a.m.

The Defendant left the bar and stopped at a convenience store for some food and beer. He then returned to the Coolidge residence, staying there just long enough to retrieve his .22 caliber semi-automatic rifle and two loaded magazines for the gun, each magazine holding ten bullets. In the car were additional bullets. The Defendant then drove to the house he once shared with his wife, where she was now living with their two daughters and her boyfriend. The Defendant parked the car away from the house, proceeded to the front door and broke in, using his shoulder to force the door open. He marched down the hall to the master bedroom, flipped on the lights, and thus awoke the two victims. The Defendant subsequently shot Ms. Honey a minimum of four times and shot Mr. Roberts a minimum of four times. He also beat them both in the head with the gun. Both victims died at the scene from multiple gunshot wounds. The blunt trauma to Mr. Robert's head was also fatal in nature.

The Defendant left the scene and drove to the Crouse household. There, he asked to use the phone and called John Coolidge. Mr. Coolidge testified that the Defendant told him, "I did it. I've fucked them up. That's all I'm going to say. I'm going to leave your car here at Eric's and I'm going to head for the woods." Theresa Crouse testified that, after the Defendant finished his phone call, he told her that he had "killed them both," that "he went there and he turned the light on and they were in bed, and he shot them both."

Eric Crouse came home a few moments later, finding the Defendant "smoking a cigarette, moping around the car." Mr. Crouse smelled alcohol on the Defendant, "real strong." Mr. Crouse described the Defendant's demeanor as "disoriented, sort of." Mr. Crouse testified that the Defendant told him, "I killed both of them. I parked the car down the road. I walked up there, I went in, turned the light on. He was in the bed with my wife, and I just killed them." The Defendant then retrieved the .22 caliber rifle from the back of the Lincoln, showing it to Mr. Crouse. Mr. Crouse testified that the stock was broken off of the gun, that "hairy stuff was on the end of it," and that there was "blood on the gun." The Defendant then walked off with the gun. Mr. Crouse called 911.

The Defendant was walking in the woods when he was spotted by Deputy Steve Davidson. When Deputy Davidson yelled at the Defendant to stop, the Defendant looked at him and then turned and walked away. A chase began but the Defendant was apprehended a short time later. When taken into custody, the Defendant had in his pockets pieces of a gun; a loaded magazine; an empty

magazine; and 61 rounds of .22 caliber ammunition. The Defendant had buried the rifle; it was never recovered.

The Defendant gave two statements to the police, the first on the afternoon of the killings and the second a few days later. In both statements, he admitted that he shot and killed the victims.

The only issue raised on appeal is whether the State adduced sufficient proof to establish that the Defendant committed the first degree premeditated murders of the victims. The Defendant contends that his killings were, at most, voluntary manslaughters.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person commits an "intentional" killing "when it is the person's conscious objective or desire to . . . cause [the death]." Id. § 39-11-302(a). See also State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Additionally,

"[p]remeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine

-3-

whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. In contrast, voluntary manslaughter "is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a).

In Tennessee, once a homicide is proven, it is presumed to be second degree murder and the State has the burden of proving the additional elements of intent and premeditation in order to raise the offense to first degree murder. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). These additional elements are questions for the jury and may be established by proof of the circumstances surrounding the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Factors which tend to support the existence of the element of premeditation include the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and calmness immediately after the killing. See id. The defendant's failure to render aid to the victim is also indicative of premeditation. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Additional relevant circumstances include facts about the defendant's prior relationship with and conduct toward the victim, from which the jury may infer a motive for the killing. See State v. Coulter, 67 S.W.3d 3, 48 (Tenn. Crim. App. 2001); see also State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001) ("establishment of a motive for the killing is another factor from which the jury may infer premeditation.") Finally, repeated blows to the victim's body, evidencing a particularly brutal killing, may be supportive of a finding of premeditation. See Sims, 45 S.W.3d at 8.

On the night of the killings, the Defendant's two daughters were in the house. The eldest daughter, Shawna, testified that a noise woke her up; she thought it was the sound of a bowl dropping. She then heard a scream. She got out of bed and observed the Defendant, her father, standing over her mother and Mr. Roberts while holding a gun. She heard someone say, "Sherri, how do you like this now?" She then saw the Defendant fire the gun more than once. She also heard her mother screaming. She left the house and ran to a neighbor's house, shouting "call 911." Shawna testified that she had heard her father threaten her mother on two prior occasions, stating "I'm going to kill you" and "You're going to be sorry."

Casey Eads, Shawna's best friend, was also in the house that night. She woke up after Shawna did and went to the master bedroom. She testified that she saw the Defendant bending over Sherri Honey, beating her with a gun. Eventually, the Defendant walked by her, but said nothing; he just left the house.

In his first statement to the police, given on the afternoon of the shootings, the Defendant stated that, before shooting them, he had told the victims that they had "messed with" him. He denied having planned the killings. He stated that he carried the gun into the house "to scare the shit out of them so they would leave [him] alone." He stated that they had "stole [his] truck and bothered [him] and tried to turn [his] girls against [him]." When asked when he decided to shoot them, he

responded that he shot Mr. Roberts "when he got under the covers and tried to hide." With respect to his estranged wife, the Defendant stated, "I just started shooting. I just lost it." He also stated, "I was okay until she had him living there; then I went off. I don't -- I know what I did was wrong, but she pushed me to this."

In his second statement, given a few days later, the Defendant explained that the rifle held ten bullets and that he took two clips to the house with him. He stated that he used "just one" of the clips during the shootings. When asked if he just started shooting when he entered the bedroom, he said, "No. I said what I had to say." He explained that he drove straight to the house after retrieving his rifle and then disassembled the rifle after the shootings. He stated that the divorce papers had been mailed near the end of February. When asked if he had made threats to his wife before, he stated, "Yes, sir. But I didn't mean it. I was just mad." He also stated that, when he broke into the house, he had no intentions of killing anyone. He also stated that he did not know that the victims were dead when he left.

During both statements, the Defendant explained that, about a month previously, Mr. Roberts had called him and threatened to kill him if he did not leave Sherri alone.

In addition to giving two statements to the police, the Defendant testified at trial. He explained that, after the phone call from Mr. Roberts, which occurred on the same day he quit his job, he decided to move to Boise, Idaho. Sherri had already filed for divorce. He was in Boise for about a week when his friend John Coolidge called and told him that Sherri wanted him to come home. Without speaking to her, he returned to Tennessee. After he arrived, he spoke with Sherri on the phone, and she told him she wanted him to help her with the girls. He continued staying with his friend, John Coolidge.

The Defendant testified that he had "tried hard" to work out his marital problems, but that "every time we did, she'd just do something, you know, to mess it up every time." Two days before he shot and killed her, the Defendant stated that he had spoken with Sherri on the telephone because she wanted him to pick the girls up. He told her he couldn't because she had his truck. He testified that, while he was explaining this to his eldest daughter, he heard Sherri in the background "cussing" him, telling their daughter that he didn't want to spend time with her, and calling him "an SOB."

The Defendant testified that, on the night of the killings, he ate dinner with the Coolidges and then went out for a drink. He stayed at the bar until about 3 a.m., drinking whiskey and beer and playing pool. He left and stopped at a convenience store, buying some food and some more beer. He explained that on the way back to the Coolidges', he "was pretty messed up and [he] started thinking about" going to Sherri's house. He admitted that he went to the Coolidges' to pick up his gun and then drove straight to Sherri's house. He explained that he "carried [his] gun with [him] because Matt had threatened to kill [him] and [he] wanted protection in case he did try to hurt [him]." He testified that he knew he did not have permission to be at the house, but he broke in anyway, explaining "I was mad because they took my truck and they'd been harassing me and . . . they just destroyed me. I didn't have nothing, and I wanted to tell them to leave me alone. I wanted

my truck back." He testified that his intentions in entering the house were "[j]ust to scare them; to tell them to leave me alone."

The Defendant claimed that he did not know "for sure" that Mr. Roberts was there and discovered his presence when he "cut the lights on and they both set up and looked at [him]." At that point, he testified, he "just lost it." The Defendant testified that "it was like I was doing things but I couldn't control myself." He testified that he did not recall seeing any of the children at the scene. He reiterated that he had not planned or intended to kill the victims, that "[i]t just happened."

On cross-examination, the Defendant explained that he took the gun to the house "for protection" and "to scare them." He admitted that he did not call in advance of his arrival, did not knock on the door, and broke through the front door to gain entrance. He strode to the bedroom where, he admitted, both victims were asleep and unarmed. They did not wake up, he testified, until he turned the light on. He then commenced his attack.

In sum, the Defendant decided at three in the morning to retrieve his semi-automatic rifle together with two clips of ammunition and drive out to the house occupied by his estranged wife and her boyfriend. He broke into the house, proceeded to the master bedroom, and awoke the sleeping and unarmed victims by turning on the light. He explained to his victims that they had "messed with" him and then fired multiple shots at both victims and brutally beat both victims with the gun, breaking it in the process. He then left the house, drove to a friend's house and told several people that he had killed the victims, even showing off the murder weapon. He subsequently disassembled and buried the gun and then tried to evade capture.

The circumstances surrounding the Defendant's actions in killing the victims are more than sufficient for the jury to have properly discredited the Defendant's claim that he had not intended or planned to kill the victims. That is, the evidence is more than sufficient to support the jury's finding that the Defendant committed two counts of first degree premeditated murder when he shot and killed Sherri Honey and Matthew Roberts. The Defendant's contention that the evidence is not sufficient to support his convictions is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

-6-